Good morning. May it please the Court, my name is Stephen Montoya. I'm here to argue my client's case, Mr. Marvin Bagley, that we believe was improperly dismissed by the district court below in reference to Mr. Bagley's retaliation claim because a material factual dispute precluded summary judgment on that issue. The facts are in large part undisputed. Back in 2008, in May, my client, who's African-American, was working, he was an apprentice, working on a construction site. Well, we know the facts. It's not worth going over them. We do know the facts. Okay. After he complained, and here's where the material factual disputes began. After he complained about the noose incident to his direct, well, not to his direct supervisor, it was his direct supervisor, Vernon McBride, who waved the noose in his face, his boss's boss, Mr. Will Guy, Marvin Bagley complained to Mr. Guy that his boss had waved a noose in his face. Not too long after that, Mr. Guy decided to involuntarily transfer Mr. Bagley to another work site. According to Mr. Bagley, Mr. Guy told him that he feared for his safety, Mr. Guy feared for Mr. Bagley's safety, that is, because Mr. McBride had been in the trade a long time and he felt that Mr. Bagley's physical safety was jeopardized. At the Dial job site, so Mr. Guy transferred Mr. Bagley to the Banner job site, sometimes referred to as the Good Samaritan job site, and there's a factual dispute regarding this. Because first of all, Mr. Guy said, that's not the reason why I transferred him. Even though Mr. Guy testified under oath that he's the one who made the decision to transfer Mr. Bagley, he couldn't remember why he was transferred. Now, Mr. Guy's boss is another guy, his name is Drew Schroeder. He also, he contradicted his subordinate, Mr. Guy, and he said, I transferred Mr. Bagley not because I feared for his safety, even though I feared for his safety, but because I feared for his safety. Even though Mr. Schroeder did admit that Mr. Guy – You're arguing the facts again, okay? If you want to stand here and tell us the facts we've already read, you can do that, but you're not getting yourself anywhere. So go ahead. Okay. I'm sorry. I mean, your real problem, as I understand it, is that you have a time bar with regard to the transfer itself. Is that right? Well, I don't think that is a problem, and I'll explain. And there are two issues. The district court concluded there wasn't a problem. A transfer in and of itself probably isn't an adverse employment action. Well, it probably is, as a matter of fact, but that's really not the issue. And it depends on whether – it depends upon the specific facts of the transfer. I'll tell you what made this involuntary transfer an adverse employment action ultimately is because ultimately it was adverse because the job ended. All right. So where I was going, and it seems to me that what is within the limitations period is the termination. Yes. And that's what the district court held. She didn't hold that the transfer was in the limitations period. She held that the termination was in the limitations period and therefore actionable. Yes. So the question is, what do we do with the connection – the legal question is, what do we do with the – and assuming for the moment that there is a sufficient conflict of material facts with regard to the reasons for the transfer, what do we do with the fact that he was then terminated? Do we then read that motive into the termination or do we – or I understand what the district court did. She said, well, as it turned out, he was simply terminated in due course for economic reasons and however he got there isn't relevant. So that's what you need to tell us, it seems to me. What is the connection between the motive of the transfer and the eventual termination? What do we do with that given the limitations period problem? Well, I think under this Court's case law, Judge Berzin, it's clear that regardless of any retaliatory intent, you cannot transfer someone to a worse position after they complain, even if you didn't mean to. Suppose you don't mean to transfer someone to a worse position, but in fact it is a worse position. I don't get your analysis. What we're talking about here is this shifting burden of proof. They came – he said he was improperly fired. They provide evidence that there was an adequate reason, appropriate reason. That's their burden of proof. And they say that it was winding down, we didn't have work for this particular apprentice, and so we had to let him go even though this person says I got him another month by transferring him. Now, then the burden shifts back to you to show that that reason is inappropriate. That is, it's really pretext and they're lying about it. I understand. So what's your evidence of that? Thank you for that analysis, Judge Wallace. I don't think they met their burden of establishing – okay, we established a prima facie case. They have a duty, as Your Honor just articulated, to come up with a non-discriminatory, legitimate business reason for the adverse action. They said, as Your Honor pointed out, hey, it was a layoff. It's a layoff. It was a layoff, but that's – there's a big problem with that. What's that? That the district court ignored completely in the district court's order. And that's this court's opinion in Davis v. Team Electric. In that opinion, this court said, quote, it's not enough for an employer to simply state that it decided to lay off a group of workers. To meet this burden, the employer must explain why it selected the plaintiff in particular for a layoff. Okay. So we disagree that, in fact, Bel Air met its burden in response to our prima facie case by merely saying that, hey, there's a layoff. Just because they laid off people doesn't explain why they laid off Mr. Bagley. And let's look at the record in that regard. Okay. Let me pursue this line of questioning. Yes, Your Honor. Thank you. On page 13 of your brief. Yes. You say, moreover, in his deposition, Mr. Guy admitted that Bel Air was way behind at the Dial Project. That's what you said. That's – and he said that over and over again. Okay. And I have all the sites to the record in that regard. Yes, so do I. And I looked at the record. Thank you. And where it came out was there was a discussion. I looked at your citation, and this was a discussion where they were talking about this knot-tying episode. And the answer was, you said, and now as foreman, aren't you supposed to teach apprentices how to do their job? Isn't that the part of the job? Answer, there's a school. We have classes. There's a knot-tying class. Were they screwing off? Yes. Should have been on the job making knots. No. Question. I hear you. Answer. Up there in the area where they were working, they were behind. That's the record. Not that the whole Bel Air was behind, but in the area where they were working. And you cited that. You cited that and put it in your brief. And that's a misleading statement of the record. Your Honor, I respectfully disagree, and I'll show you in the record where the record is much richer than that. Well, that's what you cited for your statement. That's not all I cited, Your Honor. I cited throughout, and I have all these sites here, and I'm happy to go over them with you. For example, on ER 150, this is Mr. Guy. Quote, I felt work wasn't getting done. On ER page 153, that job was in trouble, and we needed more of that going on. I was there to help the job get going again. I'm not arguing with you about that. What I'm saying is I went to your brief, saw your statement, and your citation of where you got it, and I read it, and it was in error. Well, and once again, Your Honor, I think I have a string cite, and because Mr. Guy goes throughout. For example, once again, on page 154. But my understanding, I still have it. No, you don't have a string cite. On page 154, he knew the job was a mess. In fact, Mr. Guy says throughout that the job was in trouble, the job was behind, the work wasn't getting done. I'm just pointing out for your brief, when you made the statement, you cited this record, and you miscited it. Well, Your Honor, I think when you read the record in its totality, and all of these pages were cited. I don't read the whole record. I go to the briefs, and they cite it, and I go to the record. I understand, Your Honor. Okay. Can I ask the – I still – I'm still confused about how you're dealing with the question that I raised at the outset. Let's assume that there was work to be done at – first of all, my understanding of the company's response to this point is that they lay off people according to what specific job they're doing, not the job as a whole, and that the specific work he was assigned to was completed, and they weren't going to lay off some other apprentice in order to give him a job. That's one of the things they say, right? That's not what the record says, Your Honor. That's what the record says. The lawyers say that. However, the individual who allegedly made the layoff, that would be an individual named Drew Schroeder. Here's what he – I did read what he said, but let me go on. Yes. Okay. But let's assume for my present question that you adequately demonstrated at least that there were facts in dispute with regard to why he was transferred. And given the fact, no matter what was the case of whether the job was continued or not continued, the fact that Mr. Guy, is that his name, said that he was transferring him because there was – and there was some evidence in the record that Guy said he was transferring him because the friends and family of this guy was mad at him is probably enough to demonstrate that there was a connection to the noose incident as to why he was transferred. But what do we do with the limitations period after that? Your Honor, the transfer was definitely adverse. And what made the transfer adverse was the termination. Okay. Is the transfer not outside the limitations period? The transfer itself was outside the limitations period. Right. Okay. So what I want to know, and just sit still for a minute, is it's the termination that was within the limitations period. Yes. Right. What – how do we connect what is at least, let us posit for this purpose, a material conflict in the facts with regard to the transfer to the ultimate layoff, demonstrating that the ultimate layoff was pretextual, as Judge Wallace demonstrated you'd have to do? I'll try to explain. First of all, I think there's an analogy here regarding an adverse employment action. It's kind of like a sexual harassment case. In this case, in this Court's opinion in Ray v. Henderson, like several other circuits, it – Once again, I am not disputing that the transfer was adverse and that if you filed the case in time, you may – you almost surely had a case that would go to a jury. But you didn't file the case in time. That's what I'm trying to get to. The case was not – let's assume that the transfer was adverse. Let's assume that there were at least enough facts to demonstrate pretext with regard to the transfer. The transfer is not what is actionable at this time. What is actionable at this time is the termination. Well, Your Honor, the transfer wasn't adverse until it resulted in the termination. It was set in place, but the injury didn't actually result until July 3rd of 2008. But your argument, therefore, is that we actually are looking at the termination because the termination was an – That was the heart. Just a minute. Yes. Like a continuing violation. Yes, Your Honor. Until it actually – he was actually terminated. Yes, Your Honor. It was set in motion – it was kind of like a sexual harassment case that develops over time. Oh, you're really sexy. Is that actionable in and of itself? No. But when it ultimately leads to something else, perhaps a physical assault, then it does become actionable in the totality of circumstances. So the transfer is kind of evidence of the retaliatory animus. And, Your Honor, I'd like to reserve whatever time I have left. No time left. I'll give you one minute in rebuttal. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. I'm Justin Pierce on behalf of Bel Air Mechanical. And I think perhaps the most critically important thing to understand in the context of this case is we're using terms like layoff and termination very loosely. And in the normal employment law world, we think of those things as adverse actions. In this case, and even the transfer, Judge Berzon, it's very different. This relationship, Bel Air Mechanical is one of many contractors that has a relationship with the union that provides the apprentices and journeymen, plumbers, electricians, and others for their jobs. When a job finishes, every single one of those people gets terminated. Okay, but neither of these jobs actually finished before he was laid off. No, Your Honor, but this is where Judge Bolton understood the record that was before her, which is we weren't simply laying off people without a single reason whatsoever. That's the Davis case. In the Davis case that Mr. Bagley relies exclusively on, says, hey, when you lay somebody off, you've got to provide a reason. In the Davis case ---- It's pretty flimsy to say all that was said, as far as I can tell, was the skill and available work. Yes. That doesn't tell you anything. That's the statement, Your Honor, but what the record actually shows, it explains that. What the record shows is that Mr. Bagley was a first-year apprentice. It's a five-year apprenticeship program. And this is all explained by the CEO of the company in his deposition. But no figures given, for example, as to whether other first-year apprentices were or weren't laid off, right? No, Your Honor. Well, no, the testimony was, Your Honor, that as a job is finishing, as a job is getting ---- and there is no question about that. Even Mr. Bagley himself understood. This is a $22 million. The Dial Project was huge. It was a ground-up build, the plumbing for a huge building that was years in doing. This was ---- Even Mr. Bagley said, yeah, there were a few months left. Well, that's the fit and finishing part of the project. You don't find first-year apprentices on fit and finishing parts of projects, Your Honor. How do we know that? That's Mr. ---- the deposition testimony of ---- Something about he was on the pipe fitting part and not on the plumbing part, and the plumbing was what was going to continue, something like that. Yes, he was a pipe fitter. But presumably you could have put an evidence as to whether there were any first-year apprentices who stayed on job. He didn't. Well, and, Your Honor, that's where the burden is to show with specific and substantial evidence that our reason is baloney. It's pretext. So he would need to say, well, no, that reason isn't true because, look, you had five other first-year apprentices. But as to the transfer, I mean, I find it hard to believe that as to the transfer, there wasn't sufficient evidence to get to a jury, given what Mr. Guy said about why he transferred. The undisputed evidence, Your Honor, is that Mr. Guy was not the decision-maker on that. He ---- Mr. Guy was ---- He said he was. He said he was transferring him. No. You think that's not sufficient to create a ---- it's not undisputed, first of all. I thought Guy said he did. Mr. Guy ---- No, Mr. Guy did not say I was the one who made that decision. Mr. Guy speculated that he had heard that this stuff was going on and so that, you know, he's going to need to be moved. But he was simply speculating. The person who knew what was going on was Mr. Schroeder, who said ---- But Mr. Schroeder also said that he knew that Guy said that. He did. He said, yeah, I'd heard that he said that. But, frankly, that ---- Mr. Bagley's job at the dial spot was wrapping up. Nobody disputes that. If Mr. Bagley says, well, there was other work to do, you could have moved me into another or you could have displaced me. All right. But in terms of a genuine dispute of material fact, you don't think there is enough as to the transfer that the reason he was transferred was the reason Guy said he was transferred? I guess my answer would be no, Your Honor, but the most important thing about the And it is a discreet act. Now, our argument actually in our briefs as well is that, and Judge Bolton didn't make the decision on this point, but that when he went to the banner site, when he moved to the banner site and they said, you know, we're wrapping up here too, so they had him do some cleaning up things and other stuff, he said at that moment, I knew that I was being moved for my complaint. Now, that is outside of the period too and the case law is that it's when, that that would be the discovery point and would put this outside of the limitations period. Judge Bolton didn't find it on that. We wanted to preserve that because we believed that the court could find that the entire thing was time barred. But even if you take the alleged retaliatory layoff termination, Your Honor, this is where he can't, he doesn't present specific and substantial evidence of pretext. Again, this union Yes, he has. When he finally came to it, I understood that he had two theories about that, I think. He did, but here's why none of them Can I just articulate the theories and you can tell me why they're wrong? Here's why every single one of them is wrong and it's three words. I won't articulate it. It's three words, Judge Berzon. It's eligible for rehire. The Bel Air doesn't choose its apprentices and journeymen. This is in the record. What happens is Bel Air's job finished. They returned. We know that in May, June, and July of that year, now Mr. Bagley was in July, there were 40 people sent back to the union hall from the Dial Project alone. Nearly a third of the entire workforce of Bel Air. This is 2008. This is tough construction time in Arizona. So he's marked as eligible for rehire. Go with me for just a second. The very next week, Bel Air lands a huge new job. You know what they're going to do? Based on their collective bargaining agreement, they're going to request that the union send 40 apprentice plumbers in their first and second, third year to start a brand new project. They're not going to say who they can and can't have unless somebody's marked as ineligible. So it's your argument that there is no way for an apprentice in the building trades to demonstrate that he was laid off for an illegitimate and actionable reason? Because he might get rehired? Because he could have been and would have been. But what's the relevance of it? I don't understand it. Because Bel Air marked him as eligible for rehire, if they wanted to get rid of a guy because he was a complainer, they did a very bad job of it because he could have been rehired. And the CEO and Drew Schroeder said, absolutely, the very next week, if we had asked for apprentices for a new job, if we had a new job, he could have, if he was next on the list, he gets sent right back to us. That's an if, right? I assume that, and I think I remember this from having actually represented apprentice groups and building trades. I remember that's your background, Your Honor. That you go to the bottom of the list and then you come back up again. So who knows when you're coming back up again? Well, here's the thing. Mr. Bagley received a new assignment two business days later to another job. And the apprenticeship program is, I suppose Your Honor is very well aware, is intended to get these guys experience in a lot of different areas. And so the suggestion that he was going to be with us forever, and that's again where I say the importance in this case is understanding this relationship between this contractor, these several contractors, and the union and how this works. This isn't a Davis situation. That's the case where we let somebody go and they're gone for good, and we're reorganizing. We may not ever have another job. This is a he's gone until the next opportunity for us. It could have been the next week. That is certainly something that a jury could take into account in deciding that this wasn't your motive. But I'm still trying to understand why you're, by emphasizing this, you're not arguing that simply building trades workers can't sue their employers for discrimination because they might get a job as long as they're not fired without eligibility for rehire. Is that what you're arguing? Well, what I'm saying is that that casts doubt on whether it's an adverse effect. It casts doubt, and when you get up before the jury, you can make a big deal of it. But it can't be as a matter of law that they can't bring a case for layoff or determination. But, Your Honor, if the union decides whether Mr. Bagley comes back the very next week to us, how can we have – how can it be found that there's a – that the cause for the layoff was, in fact, this complaint as opposed to the fact that this is how the process works day in and day out every day of the year? Nothing out of the ordinary happened here with regard to – and Mr. Bagley testified, people get laid off all the time. This is how it works. That's his testimony. He acknowledged that this is the way this trade works. Why would it have changed in this one circumstance? He's got to present specific substantial evidence that our reason is we said the job finished just like it always does. We sent you back to the union hall with 40 other people. Wasn't there evidence that there was a new apprentice hired after he came on? No, Your Honor, no. There was no new – There was a new journeyman and new apprentice hired after he came on, the second job. No, the evidence is that – well, he said, well, and his evidence was to the best of his knowledge, he said, which isn't evidence. It's speculation on his part that there was another apprentice at that job there, not that new apprentices are – Well, I thought it was undisputed that when he came on the job, it was just him and the foreman. No, I think there was another apprentice. And even if I'm wrong on that point, Your Honor, this is critically important. I think, again, given your background, maybe this is something that you understand perhaps more than anybody. It's a five-year program, so a first-year apprentice isn't the same as a fifth-year apprentice in terms of what they can and can't do. So he hasn't – it would be his – it would be up to him if he's going to prove specific and substantial evidence of pretext. He needed to say, no, your reason isn't right because, look, there were five other first-year apprentices on the job. The reason is essentially he was laid off in due course. I mean, that's essentially the reason. He was laid off in due course with a whole host of other people who were being laid off at or about the same time. Our evidence was that this is the closing part of the project, the primary project he was working on, in which the more senior apprentices and journeymen are going to be the ones that are going to finish this project. He does not fall into that category. But – so he gets sent back to the union hall and gets another assignment two business days later, just as it always works. So he's got to present our history, everything that was done here, was done consistent with what's been done and what continues to be done for years. He's got to show with specific and substantial evidence that somehow us doing exactly what we had always done was somehow discriminatory or retaliatory. My understanding, to go back to where I was a few minutes ago, was that he has two answers to that, which took some trouble getting out, but – which I now understand to be the following. One is that really we do go back to the transfer because the transfer is not out of time until one knows what the actual result of it was, which was termination or layoff within a few weeks, and that therefore the motive for the transfer is of direct relevance to the ultimate decision to lay him off. And you can't just cut – put a curtain down at the point of the transfer. And I guess a slight variant on that would be that knowing that he was at one time transferred relatively recently for a discrimination-connected reason, I understand that you dispute that, but in terms of at least there's some evidence of that, that you can sort of impute the motive back a second time. I guess those are the two things he's saying, and do you have a response to them? This is not a – this wouldn't fall into what we would consider a continuing violation sort of situation. Even if it was, that doesn't make the transfer actionable. All it would do is – would allow you to consider the transfer in the – with the actionable item. But again, in this situation, that doesn't apply because even Mr. Bagley himself said as soon as he arrived on the new site, he was told, why are you here? We're done here. And he – his testimony and his deposition, I knew at that moment that I was being moved out the door. Well, then that's the accrual of the claim, and that's more than four years back. So that can't be – it can't be rescued into the period just because on July 3rd was finally when he was told, okay – You are arguing essentially for a curtain drop, that you just – that we should be looking at the termination without regard to how he got there. Yes. I believe that that is what the Court should be looking at, and it needs to look at whether that is the cause as opposed to the other – and when I say look at the cause, the question is, has he presented specific and substantial evidence that we somehow went out of the ordinary in what we did? And when you look at the case in its full context, we did exactly what we've always done. Thank you, Your Honor. Thank you very much. We'll give you one minute in rebuttal. Thank you. A couple of things, Your Honor. Judge Berzin, you mentioned that they hired another guy. Bel Air's counsel just denied that. ER-78. And I was laid off on July 3rd. I don't know how long they stayed there after that, but I was laid off. Raul was working there for a while. Then another guy came. They did hire – there were two guys. We don't know that it's an apprentice. Okay. Now, a couple of things. But there is a big difference. Pardon me? There's a big difference. Well, there were two people. You know, they say they're out of work, but yet people continued to work there for months. Second of all, in fact, Mr. Guy testified that he's the one who transferred Mr. Bagley. ER-158. Quote, this is to Mr. Guy. Did you transfer Marvin Bagley from the dial site? Answer, yes. Okay. They keep on saying, oh, there are tons of reasons why we chose Mr. Bagley instead of another apprentice. However, none of those reasons are in the record. The guy who claims that he's the one who decided to terminate Mr. Bagley, Drew Schroeder, ER-262. Here's the only reason that he gives, and this is why I argued to Judge Wallace, that they really didn't meet their burden to rebut the Prima Fascia case. Here's the only reason of record. Quote, Marvin Bagley was selected for layoff on July 3, 2008, based on his skill level and available work. That is not specific enough. What was it regarding his skill level? What was it about available work? As Your Honor, Judge Burson pointed out, pipe fitters continued to work there until the job was over in December. I actually did not point that out because I thought the record was otherwise. But in any event, your time is up. Thank you for answering. Thank you. Thank you both. Thank you, Judge Noonan. Thank you both for your argument in an interesting case, Bagley v. Bel Air Mechanical. And we are adjourned. Thanks.
judges: Wallace, Noonan, Berzon